**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Finis TONEY, Jr., and John H.
Stewart, Jr., Defendants-Appellants.**

No. 77–5841.

United States Court of Appeals,
Fifth Circuit.

July 18, 1979.

Charles D. Read, Jr., Decatur, Ga., for defendants-appellants.

Hugh E. Mabe, III, Atty., Dept. of Justice, Fraud Sect., Washington, D.C., Thomas E. Morris, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before WISDOM, GODBOLD and TJO-FLAT, Circuit Judges:

GODBOLD, Circuit Judge:

Appellants Toney and Stewart were charged with engaging in a scheme to defraud in connection with the sale of distributorships for a dehydrated food product. They were convicted by a jury of two counts of using the U.S. mails for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. § 1341.[1] Toney and Stewart raise four contentions of error. First, the two uses of the mails charged in the indictment, two letters sent to the appellants by the attorney for one of the victims of the distributorship scheme, could not have been uses in furtherance of the scheme to defraud, an essential element of a § 1341 violation. Second, they cannot be held responsible for these two letters because they did not cause the letters to be placed in the mail. Third, a jury instruction charging that only "one or more" of the government's allegations of fraudulent

---

1. A third defendant, William Rice, was also convicted of violating § 1341 but did not appeal.

acts need be proved in order for the jury to infer that a fraudulent scheme had been established had the effect of reducing the government's burden of proof. Finally, the district court's failure to give their requested jury instructions dealing with credibility of witnesses and the necessary elements of mail fraud was prejudicial error. We find no reversible error and affirm the convictions.

Defendant Toney was the director of operations for Trans-World Marketing Corporation, and defendant Stewart hired and trained salesmen for Trans-World. Trans-World engaged in production of a dehydrated food chip called "Puffettes." This food product was marketed by the sale of distributorships that conferred the right to distribute Puffettes within specific areas.

Viewing the facts in the light most favorable to the government, Trans-World, as charged in the indictment, was the vehicle for a fraudulent scheme in which persons were persuaded to purchase Puffettes distributorships through the use of knowing misrepresentations about the potential profit to be made from the sale of Puffettes, the amount and quality of training a Trans-World distributor and his sales personnel would be provided, and the saleability of Puffettes. Further, as part of the scheme, Puffettes distributors were encouraged, by further misrepresentations about the likely volume of sales of the product, to build up unnecessary stockpiles of Puffettes. In addition, as part of the scheme, complaints and requests for refunds from purchasers of distributorships were evaded by using fraudulent techniques (such as using fictitious names when dealing with complaints), and Trans-World in response to complaints made misrepresentations designed to lull complaining investors into believing that Trans-World would fulfill the promises and representations it had made at the time of the distributors' initial investments.

Three elements together constitute a violation of the mail fraud statute, 18 U.S.C. § 1341:[2] (1) The accused must be proved to have participated in a "scheme or artifice to defraud," see Pereira v. U. S., 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435, 444 (1954); U. S. v. Perkal, 530 F.2d 604, 605–06 (CA4) cert. denied, 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976). (2) The defendant must "cause" a use of the mails, id., (3) which use of the mails must be "for the purpose of executing the scheme." Kann v. U. S., 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88, 95 (1944); see U. S. v. Maze, 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603, 608 (1974); U. S. v. LaFerriere, 546 F.2d 182 (CA5, 1977).

Defendants do not question that the evidence was sufficient to permit the jury to infer the existence of a scheme to defraud, or that there was sufficient evidence to show their participation in the fraudulent scheme. They argue that the instructions given the jury did not fully and accurately inform jury members of the appropriate legal standards to be applied to the facts. Moreover, they contend that the two uses of the mails specified in the indictment could not have been in furtherance of the fraudulent scheme and that, in any event, the

---

**2.** The full text reads as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

government failed to carry its burden of showing that they personally caused the two letters to be mailed.

### I. Mailings in execution of a fraudulent scheme

■ Appellants urge that the two letters specified in the indictment[3] were not mailed for the purpose of executing the fraudulent scheme. For reasons not made clear in the record or briefs, the two letters selected to be specified in the indictment were not letters mailed by employees of Trans-World but letters mailed by an attorney for one of the dissatisfied Puffettes distributors.[4]

Fred Carver, attorney for John Clubb, a Puffettes distributor, initiated a series of letters between Trans-World and himself, by mailing a letter dated May 16, 1972, to Trans-World. In this letter Carver charged that Trans-World had made fraudulent misrepresentations to Clubb, and he threatened legal action unless Trans-World agreed to repurchase Clubb's supply of Puffettes. Rice, the third Trans-World officer convicted of mail fraud in this case,[5] responded in a letter dated May 24, 1972, in which he asserted that Trans-World was ready and willing to assist Clubb in his efforts to sell Puffettes but that it was unable to do so because Clubb refused to communicate his difficulties to Trans-World. This letter concluded by requesting that Clubb "communicate with us and inform us of the marketing obstacles that he is encountering." Carver responded, in a letter dated June 1, and reiterated his demand that Trans-World repurchase Clubb's stock of Puffettes. He ended this letter by making this threat, "I do want some satisfaction in this matter and unless I can obtain same by an amicable settlement, we will proceed to court and see how you fare there." This letter, sent by Carver to Trans-World, was specified in Count 2 of the indictment as constituting a use of the mails in execution of the fraudulent scheme. Rice again replied for Trans-World, in a letter dated June 8, stating that it was not willing to repurchase Clubb's inventory and once more asking that Clubb correspond directly with them. This letter requested a reply directly from Carver: "Please let us hear from your firm (or your client) as to whether or not Mr. Clubb actually attempted to market our product."

Carver again responded in a letter dated June 16, and indicated that he was going to meet with Clubb to ascertain what efforts he had made to sell the product. In a letter of June 26, Rice replied to this letter and therein asked Carver to call Trans-World during his meeting with Clubb or to send Trans-World a summary of Carver's discussion with Clubb. Carver's reply to this letter, dated June 30, is specified in Count 1 of the indictment as a use of the mails in execution of the scheme to defraud. This letter merely restated Carver's original demand—Trans-World must repurchase the Puffettes or else Carver would file suit on behalf of Clubb. In the final letter of this protracted exchange, dated July 6, Rice restated Trans-World's position in the dispute and reiterated his request that Clubb communicate to Trans-World the difficulties he faced in marketing Puffettes.

■ The prosecution had the burden of proving that the count letters were mailed "for the purpose of executing" the fraudulent scheme. Appellants rely on *U. S. v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), and *U. S. v. LaFerriere,* 546 F.2d 182 (CA5, 1977), in arguing that as a matter of law the letters from attorney Carver to Trans-World could not have been uses of the mail in execution of the fraudulent

---

**3.** As is customary in mail fraud cases, we refer to these letters as the "count letters."

**4.** Each use of the mails in furtherance of a fraudulent scheme constitutes a separate violation of § 1341. *See U. S. v. Crockett,* 534 F.2d 589, 593 (CA5, 1976).

**5.** Rice did not appeal his conviction.

scheme. In *Maze* the Supreme Court held that a use of the mails that does not have any effect on the success or failure of a fraudulent scheme is not a mailing for the purpose of executing the scheme under § 1341. There the fraudulent scheme was the use of stolen credit cards. The Court held that the mailings to the credit card company of sales invoices by the merchants who had accepted credit cards were not in execution of the defendant's fraudulent scheme because the defendant's scheme could have succeeded even if the merchants had never mailed the sales invoices. In fact, from the defendant's point of view, as the Court pointed out, it would have been better if the invoices had never been mailed because the mailings only served to alert the credit card company to the existence of the fraud. 414 U.S. at 401–03, 94 S.Ct. at 649–650, 38 L.Ed.2d at 608–10. *LaFerriere* is an application of *Maze,* holding that a letter sent from the attorney for a victim of a fraudulent scheme to the perpetrators of the fraud was not mailed in execution of the fraudulent scheme because the "only likely effect" of the specific letter in question was "to further detection of the fraud or to deter its continuation." 546 F.2d at 187.

■ *Maze* and *LaFerriere* do not mandate a reversal in this case. These cases do not stand for the legal principle that letters mailed by victims of a fraud to the defrauders cannot be mailings in execution of a fraud. Neither case purported to modify the well-established rule that mailings from the victims can be mailed in execution of the fraud. *See, e. g., U. S. v. Hopkins,* 357 F.2d 14 (CA6), *cert. denied,* 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966); *Anderson v. U. S.,* 369 F.2d 11 (CA8, 1966), *cert. denied,* 386 U.S. 976, 87 S.Ct. 1171, 18 L.Ed.2d 136 (1967). Instead, these cases focus on the particular uses of the mail presented and each concludes after an examination of the facts that the specific mailing in question was not essential to the success of the scheme.

■ The facts of the present case differ from those of *Maze* and *LaFerriere* in one crucial respect. Here, there is much evidence that an integral part of the fraudulent distributorship scheme was that complaints from distributors were handled in such a way as to give the erroneous impression that Trans-World would take action to rectify any difficulties. The jury could have inferred that the reason for responding to complaints in this way was to delay any legal action or complaints to governmental authorities concerned with frauds, thereby prolonging the life of the fraudulent scheme. It is well-settled that such "lulling" mailings are mailings in execution of the fraudulent scheme for § 1341 purposes. *See U. S. v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). "[P]ostpurchase mailings which are designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme." *U. S. v. Ashdown,* 509 F.2d 793, 800 (CA5), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975).[6]

The courts in both *Maze* and *LaFerriere* took pains to point out that lulling was not involved in those cases and that the mailings in question could not have had a lulling effect. *See Maze,* 414 U.S. at 402–03, 94 S.Ct. at 649–650, 38 L.Ed.2d at 609–10; *LaFerriere,* 546 F.2d at 186–87. Thus these cases are expressly inapplicable to the instant case, in which the jury could reasonably have found that the lulling count let-

**6.** That money had been paid by Clubb to Trans-World before the mailings in question is not dispositive. "There is no rule that the money must change hands after the mailing." *U. S. v. Ashdown,* 509 F.2d at 799. Here, as in *Cacy v. U. S.,* 298 F.2d 227, 230 (CA9, 1961), "the scheme described in . . . the indictment was not limited to obtaining the purchase price from any particular purchaser. The scheme demanded continuity." An integral part of the scheme was reassuring past purchasers in order that future purchasers could be persuaded to buy Puffettes distributorships.

ters "comprised a fundamental part of the basic scheme and its desired continued perpetration." *See Henderson v. U. S.,* 425 F.2d 134, 143 (CA5, 1970).[7]

Appellants seem to argue that *LaFerriere* stands for the proposition that any letter mailed from a victim to the defrauders cannot possibly have a lulling effect on that victim. *LaFerriere* does not contain such a principle. In *LaFerriere* the letter from the victim's attorney was held not to have been mailed in execution of the fraud because its only effect was to alert the perpetrators that a victim had become aware of the fraud and planned to take remedial action. *See* 546 F.2d at 186. The perpetrators of the fraud did not induce the mailing in order to lull previous victims. The May 16 initial letter of complaint from Carver is analogous to the letter in *LaFerriere* in that it alerted Trans-World that another distributor had become disgruntled and was contemplating legal action.

■ The two letters charged here as violating § 1341 are not analogous to the letter in *LaFerriere.* They were mailed only after Trans-World had begun to give reassurances that Clubb's complaints would be taken care of, if only he would send Trans-World adequate reports of his difficulties. If, as the jury could find, Trans-World's motive in inviting Carver and Clubb to continue the correspondence was to lull Clubb and his attorney Carver into deferring any complaint to the authorities, then Carver's responses were an integral part of Trans-World's fraudulent scheme. So long as Carver thought there was a possibility that matters could be settled through direct negotiations with Trans-World, he was less likely to report the fraudulent scheme. Trans-World's responses encouraged him to believe there was such a possibility of amicable settlement and encouraged him to continue negotiating directly with Trans-World. Carver's uses of the mail to respond to Trans-World's invitations to continue negotiations could reasonably be found by the jury to have been mailings in execution of the fraudulent scheme.[8]

## II. Whether defendants caused the mailings

■ Since the two count letters came *from* a victim *to* the perpetrator of the fraud, the prosecution had the burden of proving that the defendants caused the letters to be mailed. Appellants contend that they cannot be held liable because they did not cause the letters to be placed in the mails. They argue that the government failed to prove causation in two respects:

7. Appellants imply that *Henderson* stands for the proposition that a letter from a victim's attorney cannot be a use of the mails in furtherance of the scheme and cannot have a lulling effect. *Henderson* holds only that the specific letter at issue was not a lulling letter. 425 F.2d at 143. That the letter was sent by a victim's attorney was not controlling.

8. Appellants make a closely related argument that must be rejected for reasons similar to those discussed in the text. The district court instructed the jury that use of the mails for the purpose of lulling victims into a false sense of security or postponing complaints is use of the mails in furtherance of a fraudulent scheme. Appellants maintain that this instruction was prejudicially erroneous because the two count letters could not, as a matter of law, have been lulling letters. Although Carver himself may not have intended these to be lulling letters, there was ample evidence from which to infer that Trans-World induced Carver to write and mail the letters for the purpose of lulling Carver and Clubb into believing that Trans-World was willing to negotiate in good faith about corrective action. Regardless of whether the content of the two letters had the effect of lulling anyone, *see U. S. v. Becker,* 569 F.2d 951, 964 (CA5), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978); *Barnes v. U. S.,* 25 F.2d 61, 64 (CA8) (letter need not show on its face that it is in furtherance of scheme), *cert. denied,* 278 U.S. 607, 49 S.Ct. 12, 73 L.Ed. 533 (1928); *U. S. v. Crummer,* 151 F.2d 958, 964 (CA10, 1945) (same), *cert. denied,* 327 U.S. 785, 66 S.Ct. 704, 90 L.Ed. 1012 (1946), the jury could reasonably find that the participants in the fraudulent scheme intended that Carver's writing and mailing of the count letters would at least delay further complaints. Thus, the jury could find the letters to have been mailed in furtherance of the lulling aspect of the fraudulent scheme and the district court's instruction allowing this inference was correct.

(1) Attorney Carver was solely responsible for causing the count letters to be mailed and (2) even if defendant Rice can be held responsible for having caused the mailing of the count letters, appellants Stewart and Toney cannot be held responsible because they had nothing to do with this correspondence.

There can be no doubt that Rice caused Carver to mail the count letters by repeatedly inviting Clubb or Carver to continue communicating with him. One "causes" the mails to be used when he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira v. U. S.,* 347 U.S. at 8–9, 74 S.Ct. at 363, 98 L.Ed. at 444. The jury was correctly instructed about the definition of causation, and there was sufficient evidence to support an inference that Rice reasonably could have foreseen that Carver would use the mails in responding to his invitations to continue negotiations.[9]

Since co-schemer Rice caused the count letters to be mailed, appellants Stewart and Toney are also legally responsible for causing these uses of the mails. It is well settled in this circuit that so long as one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails.

The guilt of the accused who were on trial was not dependent upon either of them taking part in causing the alleged use of the mails, if another accused who was a party to the alleged scheme to defraud . . . in pursuance of that scheme and for the purpose of executing it or attempting to do so, knowingly caused the alleged use of the mails.

*Smith v. U. S.,* 61 F.2d 681, 685 (CA5, 1932), cert. denied, 288 U.S. 607, 53 S.Ct. 402, 77 L.Ed. 982 (1933). *Accord U. S. v. Crockett,* 534 F.2d 589, 593 (CA5, 1976); *Buie v. U. S.,* 420 F.2d 1207, 1209 (CA5, 1969), cert. denied, 398 U.S. 932, 90 S.Ct. 1830, 26 L.Ed.2d 97 (1970); *Milam v. U. S.,* 322 F.2d 104, 107 (CA5, 1963), cert. denied, 377 U.S. 911, 84 S.Ct. 1174, 12 L.Ed.2d 181 (1964); *Belt v. U. S.,* 73 F.2d 888, 889 (CA5, 1934), cert. denied, 294 U.S. 713, 55 S.Ct. 513, 79 L.Ed. 1247 (1935). Other circuits have also adopted this rule. *See, e. g., U. S. v. Craig,* 573 F.2d 455, 482–84 (CA7, 1977), cert. denied, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 110 (1978); *U. S. v. Amrep Corp.,* 560 F.2d 539, 545 (CA2, 1977), cert. denied, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978); *U. S. v. Cohen,* 516 F.2d 1358, 1364 (CA8, 1975).[10] The jury necessarily found that Stewart and Toney were knowing participants in the fraudulent scheme. There was sufficient evidence to support this inference and Toney and Stewart do not dispute this. Therefore they are legally responsible for co-schemer Rice's causing uses of the mails in execution of the fraudulent scheme.

### III. Jury instruction regarding proof of fraudulent scheme

In mail fraud cases the government need not prove every allegation of fraudu-

---

**9.** The June 1 count letter was sent by Carver before Rice had made a specific request that Carver continue to communicate with him. Rice had only asked that Carver's client Clubb send in reports to Trans-World informing of the difficulties he was encountering in marketing Puffettes (letter of May 24). However, the jury could find that Rice could reasonably foresee that Clubb might choose to respond to this delaying tactic by allowing his attorney to reply for him through the use of the mails.

**10.** Some cases from other circuits have imposed an additional requirement that use of the mails by a co-schemer is chargeable to all par-

ticipants only if all participants could have foreseen that use of the mails would occur. *See, e. g., U. S. v. Perkal,* 530 F.2d 604, 606 (CA4), cert. denied, 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976); *U. S. v. Cohen,* 145 F.2d 82 (CA2, 1944), cert. denied, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945); *Blue v. U. S.,* 138 F.2d 351, 359 (CA6, 1943), cert. denied, 322 U.S. 736, 64 S.Ct. 1046, 88 L.Ed. 1570 (1944). This is not a requirement in the Fifth Circuit and the district court did not so charge the jury.

lent activities appearing in the indictment. It need only prove a sufficient number of fraudulent activities to support a jury inference that there was a fraudulent scheme. Failure of the government to prove one or more of its allegations is not necessarily fatal to the government's case and the trial judge may so charge the jury. *See, e. g., U. S. v. Amrep Corp.,* 560 F.2d 539, 546 (CA2, 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978); *U. S. v. Joyce,* 499 F.2d 9, 22 (CA7), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). The fraudulent activities charged here can be summarized as follows: The schemers would place newspaper ads designed to attract potential purchasers of Puffettes distributorships, and, when persons responded to these ads, would make false and fraudulent representations and promises about the profitability of Puffettes distributorships, the quality of the support services provided by Trans-World, and the saleability of Puffettes. After a person had purchased a distributorship, the defendants would evade complaints from purchasers and would send correspondence to complaining buyers designed to lull them into believing that Trans-World would fulfill the promises and representations that were made to induce the initial purchases. The proof relating to these charges was substantial and largely uncontradicted. It included, for example, proof that a brochure distributed by Trans-World to all prospective buyers contained false statements that Trans-World's Puffettes production plant contained 30,000 square feet and had been purchased for $500,000 when in fact the plant contained only 3600 square feet and had been purchased for $15,000. There was proof that Trans-World salesmen falsely told prospects that other distributors were successful in selling Puffettes (making unfounded claims of sales of up to 500 cases a week), at a time when Trans-World management had closed down the Puffettes production plant because of the poor sales of Puffettes.

There was proof that Trans-World used fictitious names when responding to complaints. Numerous examples of fraudulent lulling letters were introduced into proof. There was much other evidence of fraudulent misrepresentations and the inference that there was a fraudulent scheme is inescapable.

 The appellants assert as reversible error this jury instruction, given at the request of the government:

> It is not necessary that the government prove all of the pretenses, representations, and acts charged in the indictment. The government need only prove one or more of the representations to establish that the scheme was established.

The charge was arguably abstract or irrelevant because it speaks of proof necessary to establish that the scheme was established. As noted above, it is sufficient to prove that there was a fraudulent scheme in which defendants participated. It is not determinative that they were not on hand at the launching if they came aboard later. *See U. S. v. Perkal,* 530 F.2d 604, 605–06 (CA4), *cert. denied,* 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976). In considering a somewhat similar instruction [11] the Seventh Circuit has pointed to the possibility that the charge could be misunderstood as implying that the jury must find a scheme if it finds that any one allegation of the indictment is proved. *See U. S. v. Joyce,* 499 F.2d 9, 22 (CA7), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). The Seventh Circuit went on to hold that there was little likelihood that the instruction actually would be so misunderstood. We are of the same view in the present case, if indeed the instruction has any scope of application to the facts. Beyond that, defendants' objections to the instruction did not apprise the trial judge of the asserted deficiency that is now pressed. Defendants said: "It [the government's requested instruction] would

---

**11.** This instruction read: "It is essential only that one or more of them [pretenses, represen-

tations and acts charged in the indictment] be proved to show the existence of the scheme."

be misleading and would indicate that perhaps the government doesn't have to prove its indictment as charged, Your Honor. So, we would object to that one." This implied that the government was required to prove all allegations of the indictment and that the instruction improperly departed from this standard. Had the judge been advised that the objection was to "one or more" as opposed to "one or more so long as sufficient to indicate beyond reasonable doubt the existence of a scheme" he might well have changed the phraseology. If error, it was not reversible.[12]

### IV. Failure to give jury instructions requested by defendants

There was no error in the district court's refusal to give jury instructions requested by defendants. All except one were covered in the charge though in some instances in less elaborate form. Requested instruction 22 states that each defendant must be found to have personally caused the mailings in question. The district court properly instructed that each individual defendant's participation in the fraudulent scheme must be proved beyond a reasonable doubt. He did not instruct that each mailing must have been personally caused by each individual defendant. He did charge that at least one member of the scheme must have caused a use of the mails and that this action by one schemer is legally chargeable against his co-schemers. As discussed above, this is an accurate statement of Fifth Circuit precedent.

AFFIRMED.

---

**12.** The Fifth Circuit Pattern Jury Instructions pertaining to mail fraud incorporate a precise statement of the principle that all allegations of fraud need not be proved:

> It is not necessary that the Government prove all of the details alleged in the indictment concerning the precise nature and purpose of the scheme. . . .

Also unobjectionable is the instruction recommended in 2 Devitt & Blackmarr, Federal Jury Trial Instructions § 54.18 (3d ed. 1977):

While a number of representations are alleged in the indictment, it is not incumbent upon the government to prove each and every one of them, but it is incumbent upon the government to prove one or more, or a sufficient number of them to indicate and show to you beyond reasonable doubt that the scheme alleged was actually set up.