**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Terrell KNIGHT and A. C.**
**Brown, a/k/a Cadillac,**
**Defendants-Appellants.**

**No. 79–5192.**

United States Court of Appeals,
Fifth Circuit.

Dec. 7, 1979.
Rehearing Denied Jan. 4, 1980.

Tommy Day Wilcox, Macon, Ga., for James Terrell Knight.

Denmark Groover, Jr., Macon, Ga., for A. C. Brown.

D. L. Rampey, Jr., U. S. Atty., William G. Boyd, Asst. U. S. Atty., Joseph M. Lawless, Atty., Public Integrity Section, Dept. of Justice, Macon, Ga., for plaintiff-appellee.

Before GODBOLD, RONEY and FRANK M. JOHNSON, Jr., Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

A jury of the United States District Court for the Middle District of Georgia

convicted both A. C. Brown and James Terrell Knight of nine counts of mail fraud. Brown and Knight appeal the convictions. We affirm.

## I. FACTS

Preston Leon Bridges served as comptroller of Bassett Furniture Industries of Georgia (Bassett) in the early 1970's. In 1971, Bridges met Leonard Wesley Horton through their common interest in gambling and a close relationship developed. A twenty percent pay cut in 1971 and a notable lack of success in the practice of his avocation put Bridges in financial straits. Bridges and Horton discussed their financial problems and devised a scheme through which Bridges would embezzle Bassett funds.

The duties of Bridges as comptroller of Bassett included, among others, issuing checks to pay Bassett's suppliers. As a part of the scheme Bridges wrote checks payable to legitimate Bassett suppliers (Evans Products and Rex Plastics) based on duplicate invoices of supplies Bassett had already received and paid for. The result was that Bassett paid twice for those supplies. Contrary to the practice generally employed in writing legitimate checks, however, the address of the payee of each bogus check was not typed on its face. After Bridges issued the checks, he turned them over to Horton whose role was to pass the checks on to people who would set up dummy bank accounts in the names of the legitimate suppliers and then negotiate the checks through these accounts. Bridges was to receive forty percent of the proceeds of the operation, Horton ten percent, and the remaining fifty percent was to go to the person or persons who converted the checks into cash.

Horton contacted Brown, whom he had known for nearly twenty years, to arrange to have the checks cashed. Bridges photocopied the backs of legitimate cancelled Bassett checks made out to the two suppliers and furnished the copies to Horton. Horton in turn gave them to Brown who had rubber stamps made to duplicate the endorsements of Evans Products and Rex Plastics.

In March of 1973, after Brown came into the operation, an account at an Atlanta bank was opened in the name of Carlton Lee Evans, d/b/a Evans Products Company. The address given to the bank to which monthly statements were mailed was 1180 Springdale Road in Atlanta. In April, 1974, a second account in the same Atlanta bank was opened in the name of Carlton Lee Evans, d/b/a Rex Plastics, and the bank was given the same Springdale Road address.[1] The bank also mailed the Rex Plastics account statements to the Springdale Road address.

Between March, 1973, and October, 1974, Horton obtained from Bridges thirty two bogus checks. Horton, in turn, passed them on to Brown. The checks were deposited in the two accounts in the Atlanta bank and, after the checks cleared seven or eight days later, withdrawals from the accounts were made and the proceeds divided. Bassett's home bank mailed the cancelled checks back to the company as part of its regular bank statement.

## II. MAIL FRAUD

In order to prove a violation of the federal mail fraud statute, 18 U.S.C. § 1341,[2] it is

---

1. The Atlanta address belonged to neither of the legitimate companies. They were headquartered in North Carolina and neither had any Atlanta bank accounts. Rather, 1180 Springdale Road was the residence of Raymond Walden and his wife Bobbie.

2. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.

necessary to show the presence together of three elements: (1) defendants' participation in a "scheme or artifice to defraud," *United States v. Toney*, 598 F.2d 1349, 1351 (5th Cir. 1979); *see Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Perkal*, 530 F.2d 604, 605–06 (4th Cir.), *cert. denied*, 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976); (2) use of the mails "caused" by someone associated with the scheme, *Pereira v. United States, supra*, 347 U.S. at 8, 74 S.Ct. 358; *United States v. Toney, supra*, 598 F.2d at 1351; *United States v. Perkal, supra*, 530 F.2d at 606; and (3) use of the mails "for the purpose of executing the scheme." *Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944); *United States v. Toney, supra*, 598 F.2d at 1351.

Knight and Brown concede the existence of a scheme to defraud. Indeed, it would be unrealistic to argue otherwise; Bassett lost more than one half million dollars because of the scheme. Similarly, defendants concede the use of the mails. They dispute, however, that the evidence sufficiently linked them to the enterprise and that the mails were used "for the purpose of executing [the] scheme." We consider first the question of the nexus necessary between the mails and a scheme to defraud.

A. According to Knight and Brown, we must reverse their convictions because use of the mails was not an "integral" part of the plan to defraud Bassett. Defendants, however, apply the wrong standard. "[T]he statute requires not a 'but for' relationship [between the mailing and execution of the scheme] but only that the defendant use the mails in 'furtherance' of the fraud . . ." *United States v. Buchanan*, 544 F.2d 1322, 1325 (5th Cir.), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977). It is well settled that use of the mails will support a mail fraud conviction if it is "incident to an essential part of the scheme." *Pereira v. United States, supra*, 347 U.S. at 8, 74 S.Ct. at 363; *United States v. Shryock*, 537 F.2d 207, 209 (5th Cir. 1976), *cert. de-*

*nied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977); *United States v. Shepherd*, 511 F.2d 119, 122 (5th Cir. 1975). The mail must be used " '*in employing* the scheme however incidental the mailings may be.' " *United States v. Ashdown*, 509 F.2d 793, 799 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975), *quoting United States v. Schaefer*, 299 F.2d 625, 630 (7th Cir. 1962) (emphasis in *Schaefer*).

■ Defendants' convictions were based on the mailed bank statements for the two accounts in the Atlanta bank and on the cancelled checks mailed back to Bassett. Those mailings support the "use of the mails" element in these mail fraud convictions. Knight and Brown rely heavily on *Kann v. United States, supra*, 323 U.S. at 94, 65 S.Ct. 148 and *United States v. Maze*, 414 U.S. 395, 402, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), for the proposition that once money is obtained, any subsequent mailings cannot justify conviction. Many times we have affirmed convictions based on mailings made after victims had been relieved of their money. *See, e. g., United States v. Toney*, 605 F.2d 200, 205 (5th Cir. 1979); *United States v. Zweig*, 562 F.2d 962, 964–65 (5th Cir. 1977); *United States v. Ashdown, supra*, 509 F.2d at 799. *Kann* and *Maze* hold merely that under the facts of those cases the fraudulent schemes had ended before the mailings occurred. If the scheme continues, mailings made after receipt of the money can clearly support conviction. *United States v. Ashdown, supra*, 509 F.2d at 799. In the present case the scheme had not "reached fruition" within the meaning of *Kann* and *Maze* each time a bogus check was cashed. The enterprise continued for well over a year and defendants cashed over thirty of the checks.

The mailings at issue here, since they resulted from attempts to ensure "prevention of [the scheme's] detection," *United States v. LaFerriere*, 546 F.2d 182, 187 (5th Cir. 1977), fall within the scope of § 1341. In opening the two Atlanta accounts, a

mailing address was of assistance in establishing an appearance of legitimacy. Similarly, when Bassett's Georgia office received the cancelled bogus checks, Bridges typed on them the addresses of the legitimate companies in order to conceal the existence of the scheme from Bassett's auditors. Nevertheless, Knight and Brown argue that, since the action turned out not to be a factor preventing eventual discovery of the scheme, it was not "necessary" to further the scheme and therefore not "for the purpose of executing" the fraud. The argument is meritless. It once again ignores that a mailing need merely be "incidental" to the plan. Further, it would be entirely illogical if action to conceal fraud is required to be successful in order to satisfy the statute. Success of the scheme to defraud is not necessary under § 1341. *United States v. Schaffer*, 599 F.2d 678, 680 (5th Cir. 1979); *see United States v. Green*, 494 F.2d 820, 822, n.4 (5th Cir.), *cert. denied*, 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280 (1974). Neither can success be a factor in determining whether activity is "for the purpose of executing" a scheme to defraud.

■ B. Defendants also argue that the evidence was insufficient to prove their participation in the plan to defraud Bassett. Under such circumstances we view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the government. *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Summers*, 598 F.2d 450, 452 (5th Cir. 1979). Applying the standard, it is clear that there was adequate evidence to link defendants to the fraud. The evidence against Brown was overwhelming. In addition to the devastating testimony of Horton, Brown's fingerprints were taken from a bogus check and two of the deposit slips for the Atlanta bank accounts.

The evidence also reflected Knight's involvement in the enterprise. Horton observed Knight at Brown's residence on several occasions within an hour after Horton delivered bogus checks to Brown. Further, a number of times Brown called Horton to divide proceeds of the operation shortly after Horton had seen Knight at Brown's home. Mrs. Walden, who lived at the Springdale Road address, testified that her husband had rented a room in their home to some unknown person who never used the room. Business mail came to the address for the unknown tenant and Mrs. Walden was paid for leaving it in the mailbox or in her car. Mrs. Walden also testified that for twenty years Knight had been a close friend of her husband. Most significantly, Knight left his fingerprints on one of the checks and ten of the deposit slips and refused to provide the government with a handwriting sample for comparison with the signature cards filled out when the Atlanta bank accounts were opened.

### III. DEFENDANTS' INVESTMENTS

■ Knight and Brown argue that the trial court committed reversible error in permitting the government to introduce evidence of a substantial investment in real estate made by them at the end of 1974. The evidence is clearly relevant under Rule 401 of the Federal Rules of Evidence. Further, its probative value is not "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. We find no error by the trial court in admitting the evidence. *See United States v. Frick*, 588 F.2d 531, 537 (5th Cir.), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979).

### IV. LIMITATIONS ON CROSS-EXAMINATION

■ Defendants complain of the limitation of their cross-examination of Horton and the government's fingerprint expert. In neither instance did the district court err.

A. At trial on their cross-examination of Horton, defendants attempted to delve into details of his prior convictions and the plea bargain arrangement he had made with the government in exchange for his testimony. Specifically, Knight and Brown attempted to show that Horton's arrangement was

motivated by an overriding fear of serving time in the Georgia state penitentiary and therefore his testimony deserved no credence.

The jury heard evidence of both the number and character of Horton's prior convictions. That is all that is required under *Beaudine v. United States*, 368 F.2d 417, 421 (5th Cir. 1966), and *Bendelow v. United States*, 418 F.2d 42, 48 (5th Cir. 1969), *cert. denied*, 400 U.S. 967, 91 S.Ct. 379, 27 L.Ed.2d 387 (1970). Brown's counsel in closing argument vigorously asserted his view of the "deal" Horton had made and that Horton's testimony was untrustworthy. Clearly the jury was exposed to enough facts to permit them to fully evaluate the reliability of Horton as a government witness.

■ B. With regard to Ms. Pace, the government's fingerprint expert, the trial court refused to permit defendants to inquire whether she had compared the prints taken from checks and deposit slips with those of unnamed persons other than defendants. The court, however, allowed defendants to question the witness along this line so long as she was asked if she had compared the prints with those of specific people. Defendants were not prohibited from developing the information. That they did not do so should not benefit them now. The court did not improperly limit the cross-examination of witness Pace.

## V. REFUSAL TO PROVIDE HANDWRITING EXEMPLAR

■ In its instructions to the jury the district court commented upon defendant Knight's refusal to provide a handwriting exemplar as ordered by the court:

> Now ladies and gentlemen, you have heard evidence introduced by stipulation that the defendant, James Terrell Knight, refused to obey an order of this Court that he furnish handwriting specimens. And you have heard . . . that he was asked to furnish [handwriting specimens] for the purpose of . . comparison [with] the handwriting obtained on certain documents and records. The law, ladies and gentlemen, provides that an order to furnish handwriting samples or exemplars is a lawful order. That order, therefore, in no way violated any of Mr. Knight's legal or constitutional rights. I charge you that the conduct of the defendant in refusing to furnish those handwriting specimens, if you find beyond a reasonable doubt that he did so refuse, is not alone sufficient to establish his guilt because innocent persons sometimes decline to give evidence to authorities even when ordered to do so. However, such conduct including all of the events related thereto, is a circumstance from which the jury may, if it chooses, reasonably draw the inference and find, in light of the surrounding circumstances, that the defendant Knight believed that the comparison of his handwriting with the signatures on the documents obtained by the Government would be unfavorable to [him] and favorable to the prosecution. The law does not require that you draw such an inference. You are the sole judges of the facts. Bear in mind that the law never imposes upon any defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

The court committed no error in so instructing the jury. Handwriting exemplars fall outside the protection of the Fourth Amendment and comment on the refusal to provide an exemplar is permissible. *United States v. Nix*, 465 F.2d 90, 93–94 (5th Cir.), *cert. denied*, 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307 (1972).

AFFIRMED.