**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Orrin SHAID, Jr., Defendant-Appellant.**

No. 83–2397.

United States Court of Appeals, Fifth Circuit.

April 6, 1984.

David Booth, Longview, Tex., for defendant-appellant.

Chris Harrison, Asst. U.S. Atty., Tyler, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, and POLITZ and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge.

In May of 1981, Orrin Shaid, Jr., a convicted bank swindler described by the prosecution as a "charismatic 300-pound east Texan", gained access to the Ranchlander National Bank in Melvin, Texas and masterminded an elaborate bank-fraud scheme that ultimately enabled him to generate a high-rolling life style including two Rolls Royces, a yacht known as the "African Queen", two airplanes, and a large lakehouse on fourteen acres. Shaid's scheme resulted in losses of over $778,000 to banks in the Texas cities of Abilene, Chandler,

1. 18 U.S.C. § 1341.

2. 18 U.S.C. § 1014.

3. 18 U.S.C. § 2113.

Corpus Christi, and Kilgore. Shaid's enjoyment of his east Texas Camelot, however, was shortlived, for today he comes before this Court convicted of nine counts of mail fraud,[1] eight counts of making false statements to a federally insured bank,[2] and two counts of entering a bank with intent to commit a felony.[3] We affirm Shaid's convictions on all counts and affirm the thirty-five year sentence given him.

## I. THE BANK FRAUD SCHEME: FROM RAGS TO RICHES

In the summer of 1978 and 1979, Shaid was living in a trailer house on his father's property. Then, in the first part of 1982, Shaid expressed interest in buying the Ranchlander National Bank in Melvin, Texas. Because Shaid had been convicted previously of bank fraud, he could not obtain a bank in his own name, so he decided to place the bank in the name of Lynn Carruth Maree, a woman with whom Shaid lived and by whom he had a child.

In April 1982, Shaid approached Doyle Todd, then the president of the Ranchlander National Bank, posing as the financial consultant for Lynn Carruth Maree and offered to purchase the bank. On May 8, 1981, a purchase contract was signed in which Todd turned over control of the Ranchlander National Bank to Lynn Carruth Maree pending the approval of the transfer by the Comptroller of the Currency. In June of 1981, Todd was locked out of the bank by Shaid even though the actual purchase of the bank did not take place until September 4, 1981. The purchase price was paid in three checks in the amounts of $177,712.64, $1,197.00 and $7,115.00. Documentary evidence presented in the case demonstrated that Shaid was able to raise the funds for the purchase of the bank by buying two $1,000 CD's at the Ranchlander National Bank, altering them to $100,000 CD's,[4] and pledging these as collateral to

4. At trial, Jean Moon, once Shaid's partner in crime, described the process for altering the CD's. Ms. Moon stated: "... he was there and he showed me how you take a piece of blank paper, cover the bank's receipt and you have to

secure a $200,000 loan from the Chandler State Bank in Chandler, Texas, on September 8, 1981.

Once in control of the Ranchlander National Bank, Shaid initiated a widespread scheme of fraudulent loans at the Ranchlander National Bank and banks across Texas. During trial, twenty witnesses testified and numerous documents were introduced. The evidence demonstrated how Shaid, on four separate occasions using four different pairs of altered CD's,[5] received or renewed $200,000 loans by pledging the altered CD's as collateral. In his ongoing scheme, Shaid would pay off loans as they came due using money obtained by forging additional CD's or by setting up false loans secured by nonexistent or overvalued collateral at the Ranchlander National Bank, which were then "participated" to other banks.[6]

In March of 1982, Ms. Jean Moon, who had been installed by Shaid as president of the Ranchlander National Bank, decided to leave the bank because of Shaid's activities. When Shaid learned of her plans, he flew to the bank[7] and told her she could not quit—"She was in too deep." At this time, Shaid explained to her how he had been purchasing $1,000 CD's at the Ranchlander National Bank, altering them to $100,000

CD's and pledging these for loans at other lending institutions. Moon then became an active participant with Shaid in the fraudulent scheme. From March through November, Moon assisted Shaid in preparing the fraudulent CD's and, pursuant to Shaid's orders, made false responses to the victim banks' inquiries into the validity of the pledged CD's. By September 1982, Moon realized Shaid had no intention of paying off the fraudulent CD's as he kept pyramiding more and more fraudulent loans.

When Moon once again expressed concern, Shaid showed her a picture of a villa he had planned to purchase for one million dollars in Acapulco, Mexico and told her that she should relax and continue to hide the fraud from the bank examiners. Shaid told Moon that if anything did happen, he would take her to Acapulco with him. Finally, in November of 1982, Shaid phoned Moon and instructed her to destroy the records and microfilm at the Ranchlander National Bank. Instead, realizing that Shaid's departure was imminent, Moon drove to San Antonio, Texas, where she contacted FBI agents. After a lengthy FBI investigation, Shaid was charged in a nineteen count indictment and was convicted on all nineteen counts.[8] The district

be a good enough typist to know where each of the blocks go and you just type them in the bank's receipt for $1,000 because it must be a carbon on the bank receipt, and then you take the original and type it in for $100,000." Record. vol. 9 at 392. As a result of this process, the Ranchlander National Bank retained two carbon copies indicating that it had issued two $1,000 CD's and Shaid received two original Ranchlander National Bank CD's indicating a value of $100,000 each. Shaid then would pledge the altered $100,000 CD's as collateral.

5. The evidence demonstrated that Shaid obtained a loan at the Chandler State Bank on September 8, 1981 using altered CD's numbered 1401 and 1402, obtained an additional loan from Chandler State Bank using a different set of altered CD's (1426, 1427) on January 29, 1982, and later renewed the January 29th loan using yet a different set of altered CD's numbered 1498 and 1499. It also was established that Shaid utilized altered CD's numbered 1481 and 1482 at the Stonewall Bank in Corpus Christi and renewed that loan using altered CD's numbered 1558 and 1559.

6. Often, banks will transfer, or "participate", an existing loan to another bank in an effort to maintain an appropriate debt-equity balance.

7. The Ranchlander National Bank is located in the western part of Texas but Shaid lived in the eastern part of the state. However, transportation was no problem for Shaid, who had purchased two airplanes with his ill-gotten gains.

8. Counts one through nine of the indictment allege violations of 18 U.S.C. § 1341 (mail fraud) and relate to nine distinct and different mailings between the Ranchlander National Bank and the victim banks concerning the validity of the collateral (i.e., altered CD's) Shaid used in acquiring the loans. Counts ten through seventeen allege violations of 18 U.S.C. § 1014 (making false statements to federally insured bank) and involve eight distinct and different false statements made, or caused to be made, by Shaid in acquiring the loans. Counts seventeen and eighteen allege violations of 18 U.S.C. § 2113 (entering a bank with intent to commit a felony) and relate to two distinct and different occasions when Shaid entered federal-

judge sentenced Shaid to a total of thirty-five years imprisonment.

## II. THE MAIL FRAUD COUNTS (COUNTS ONE THROUGH NINE)

■ Initially, appellant argues that his conviction on four of the mail fraud counts (one, two, four, and six) alleging violations of 18 U.S.C. § 1341, must be overturned since the government failed to demonstrate that Shaid "caused" the mailings described in the respective counts. The "mailings" referred to relate to letters from the Chandler State Bank to the Ranchlander National Bank in which the Chandler State Bank sought verification of the validity and value of the pledged CD's.[9] Appellant's argument is without merit since, although appellant himself did not actually mail any of the documents referred to in these counts, it is apparent that he did *cause* the mailings to occur. We have held that when an individual does an act with the knowledge that the use of the mails will follow in the ordinary course of business, or when such use can reasonably be foreseen, even though not actually intended, then he/she "causes" the mails to be used. Nothing more is required to demonstrate that Shaid "caused" the mailings. *See, Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954); *United States v. Martino,* 648 F.2d 367, 382 (5th Cir.1981); and *United States v. Toney,* 598 F.2d 1349, 1352–54 (5th Cir.1979).

During the course of the instant trial, it was shown that Shaid could reasonably foresee and did know that the victim banks would correspond through the mail to notify the Ranchlander National Bank that a number of Ranchlander CD's had been pledged by Shaid as collateral, and would seek verification of the CD's validity and value. Thus, although Shaid did not request the mailings, it is clear that he knew the victim banks, in the ordinary course of their business, would use the mails to seek verification of the CD's. Moreover, several witnesses testified that the appellant fully understood the operation of a bank. Indeed, Shaid met with other bankers in Texas on numerous occasions and several of them testified that he appeared to have complete working knowledge of the banking business.

Simply put, the record demonstrates that Shaid could reasonably foresee and did know that his pledging of the $100,000 CD's (which were altered $1,000 CD's) would result in the victim bank making inquiries and seeking written verification of the CD's, that a major portion of this correspondence would be by mail, that Shaid made detailed plans to respond 'to these letters,[10] and that as a result of these responses he kept the victim banks from learning the true value of the fraudulent CD's and of the fraudulent scheme.

■ Appellant next argues that none of the mailings described in counts one through seven "implemented" the scheme because the mailings occurred after the appellant had received control of the money.[11] Under appellant's theory, once a de-

---

ly insured banks intending to make false statements (i.e., that he owned CD's worth $200,000).

**9.** Specifically, count one refers to a letter from Chandler State Bank seeking verification of pledged CD's numbered 1426 and 1427, count two refers to a letter from Chandler State Bank requesting verification of renewal of CD's 1426 and 1427 with CD's 1498 and 1499, count four relates to a letter from Charlie Maner, President of Chandler State Bank, requesting verification of the issuance of two CD's in Orrin Shaid's name, and count six refers to a letter from Chandler State Bank requesting acknowledgment that CD's 1498 and 1499 were being held as collateral.

**10.** Indeed, Jean Moon testified about Shaid's instructions concerning the victim banks inquiries. Moon was instructed to go through the mail at the Ranchlander National Bank and to *pull out letters from the victim banks so that a fraudulent response could be fabricated. See,* Record, vol. 9 at 398, 417–18.

**11.** The mailings referred to in counts one, two, four, and six relate to letters from the Chandler State Bank to the Ranchlander National Bank and are described in detail in footnote nine. *See,* n. 9, *supra.* Counts three, five, and seven relate to letters from the Ranchlander National Bank to the Chandler State Bank in which altered CD's were verified and acknowledged by the Ranchlander National Bank. Appellants ar-

fendant obtains the money, subsequent mailings cannot be used as mail fraud counts. This theory fails, however, since the result of the mailings was to "delay any legal action or complaints to governmental authorities concerned with frauds, thereby prolonging the life of the fraudulent scheme." *United States v. Toney*, 598 F.2d 1349 (5th Cir.1979). As this Court stated in *Toney:*

> It is well settled that such 'lulling' mailings are mailings in execution of the fraudulent scheme for § 1341 purposes .... Postpurchase mailings which are designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme. *United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir.) *cert. denied* 423 U.S. 829 [96 S.Ct. 48, 46 L.Ed.2d 47] (1975).

*United States v. Toney*, 598 at 1353.

The mailings from the victim banks were inquiries into the substance and validity of the pledged CD's; they had no other purpose. The responses from the Ranchlander National Bank were designed specifically to keep the victim banks from learning the true status of the collateral, and, thus, were intended to have—and had—a lulling effect. Hence, it is clear that these lulling letters sufficed to establish violations of 18 U.S.C. § 1341.

■ Appellant also contends that the district court improperly imposed consecutive sentences on counts one through seven, since only one mail fraud scheme was involved. However, as the facts indicate, Shaid's elaborate scheme involved the use of fraudulent CD's on numerous occasions [12] and resulted in several fraudulent loans. It is well established that each use of the mails is a separate offense under the

mail fraud statute and that consecutive sentences may be imposed properly, even if the mailings arose from a single concerted plan to defraud. *See, United States v. Calvert*, 523 F.2d 895 (8th Cir.1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *United States v. Shelton*, 669 F.2d 446 (7th Cir.1982), *cert. denied*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454; and *United States v. Benmuhar*, 658 F.2d 14 (1st Cir.1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328, *reh'g denied*, 458 U.S. 1132, 103 S.Ct. 16, 73 L.Ed.2d 1402.

■ In a related argument, appellant contends that consecutive sentences on counts one through seven constitute cruel and unusual punishment in violation of the eighth amendment. This contention is frivolous. The able and experienced district judge was very familiar with Mr. Shaid, having presided at his trial and having sentenced him to eight years imprisonment in 1972 for a similar bank embezzlement scheme,[13] for which Shaid was still on parole when he committed the present offenses. Moreover, the presentence report made available to the district judge indicated that Shaid had numerous prior convictions, which include the following: (1) defrauding an innkeeper; (2) forging and passing fraudulent documents; (3) felony theft by false pretext; (4) false representation of FDIC insurance; (5) misapplication of bank funds; and (6) probation violation. The sentence clearly does not constitute cruel and unusual punishment; the sentence is within the time period promulgated by Congress for violation of 18 U.S.C. § 1341; and, in light of Shaid's previous record, it cannot be said that the sentence imposed was inappropriate.

---

gument, however, does not rely upon the fact that certain of the documents were mailed by the Chandler State Bank instead of the Ranchlander National Bank. To the contrary, appellant simply argues that none of the mailings—regardless of their origin—implemented the scheme since Shaid already had received the loan funds when the mailings occurred.

**12.** *See,* n. 5, *supra.*

**13.** Shaid previously had been convicted of forty-five counts involving bank fraud and embezzlement.

## III. THE FALSE STATEMENT COUNTS (COUNTS TEN THROUGH SEVENTEEN)

Shaid contends that six of the eight counts charging him with making false statements to a federally insured bank are multiplicitous. Specifically, Shaid contends that counts ten, eleven, fourteen, fifteen, sixteen, and seventeen are multiplicitous since only two loans were involved. However, close examination of the challenged counts reveals that the counts are not multiplicitous.

Counts 10 and 11 arise out of a $200,000 loan made to the appellant at the Chandler State Bank on September 8, 1981. As collateral for the loan Shaid pledged two $1,000 CD's, which had been altered to represent $100,000 CD's. In Count 10, Shaid was charged with a false statement in representing that he owned CD 1402 of the value of $100,000, when he knew it had a value of only $1,000. In Count 11, Shaid was charged with a false statement in representing that Lynn Carruth Maree was the owner of CD 1401 of the value of $100,000 when he knew it had a value of only $1,000.

Counts 14, 15, 16 and 17 arise out of Shaid's creation of fraudulent loans at the Ranchlander National Bank in November of 1982. The background for these loans must be understood. Loan 1706 to Orrin Shaid is for $97,000. A forged loan to Richard T. Carson in the amount of $126,000 was also created. The funds of these loans were used to pay off a $200,000 loan at the Chandler State Bank from January, 1982, in which Shaid used two altered $100,000 CD's. The Richard T. Carson loan was then transferred via a $125,000 participation loan [14] to the First National Bank of Kilgore in November 1982, resulting in a loss to that bank of the full amount of the participation loan.

The following counts emerged from these loans. Count 14 involves the forged vendor's lien note in the name Richard T. Carson. Count 15 involves a fraudulent warranty deed, representing that Carson had been conveyed four tracts of land by Shaid for consideration paid by Carson when Shaid knew no such conveyance had taken place and no consideration had been paid. This land was putatively the collateral for the loan at Ranchlander National Bank. Count 16 involves a forged deed of trust to this land when Shaid knew that Carson had not signed the deed of trust. Count 17 involves a fraudulent appraisal of the value of the two tracts of land also pledged as collateral. This appraisal was prepared for and forged by Shaid in the name of Linda Freeland.

While only two loans resulted from the false statements referenced in the challenged six counts, it is clear that each of the six counts involve completely different false statements in distinct and separate documents. In *Bins v. United States*, 331 F.2d 390 (5th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964), this Court stated:

> Whether a continuous transaction results in the commission of but a single offense or separate offenses is not dependent on the number of unlawful motives in the mind of the accused, but is determined by whether separate and distinct prohibited acts, made punishable by law, have been committed. [Citations omitted]. *The filing of each false document would constitute a crime, and each should be alleged in a separate and distinct count of the indictment.*

*Id.* at 393 (emphasis added). Each of the challenged counts describe distinct and separate violations of 18 U.S.C. § 1014; each count sets forth a different false statement made in distinct and separate documents necessitating different proof. Hence, the six challenged counts are not multiplicitous since the counts allege six separate and distinct prohibited acts concerning six different documents. Finally, we note that any prejudice suffered by Shaid due to the allegedly multiplicitous counts was negated by the district court's imposition of concurrent sentences on the challenged counts.

14. *See,* n. 6, *supra.*

■ Appellant also maintains that there is insufficient evidence to support the jury's verdict on count thirteen. Count thirteen involves a statement made by Shaid on May 1, 1982, in which Shaid represented that he was the owner of two CD's, each allegedly worth $100,000, when he knew they both were worth only $1,000. This statement was made for the purpose of influencing the actions of the Chandler State Bank to approve a renewal of a $200,000 loan made on January 29, 1982, which would have been due absent a renewal.[15] Appellant claims, however, that no evidence was introduced demonstrating that the statement had the actual effect of influencing the institution's decision to renew the loan. However, the essence of a § 1014 offense is the making of the false statement with the *intent* to influence the lender, and it is not dependent upon the accomplishment of that purpose. *See United States v. Phillips,* 606 F.2d 884 (9th Cir.1979), *cert. denied,* 444 U.S. 1024, 100 S.Ct. 685, 62 L.Ed.2d 657; *United States v. Kennedy,* 564 F.2d 1329, 1341 (9th Cir. 1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). It is a crime of subjective intent requiring neither reliance by the bank officers nor an actual defrauding. *United States v. Bonnette,* 663 F.2d 495 (4th Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 666 (1982). Therefore, whether the statement could or did influence the bank is not at issue. The issue is simply whether sufficient evidence was presented for the jury to conclude that the defendant made the false statement with intent to or for the purpose of influencing the bank to renew the loan.

■ In April, 1982, Shaid made a request to Charlie Maner, the President of Chandler State Bank, that the January 29, 1982 loan be renewed. Since the two fraudulent $100,000 CD's used to secure the January 29th loan also were mature, Mr. Maner told Shaid that the bank had to have two more

CD's. Shaid agreed. Then in the normal course of business, the original CD's were mailed from the Chandler State Bank to the Ranchlander National Bank and two new fraudulent $100,000 CD's (1498 and 1499) were supplied to the Chandler State Bank. Mr. Maner, testified that he never directly asked Shaid if any of the $100,000 CD's were worth that amount because the CD's were made out in that amount.

On this evidence, the jury could conclude that Shaid made the representation that the altered CD's were worth $200,000 in an attempt to influence the bank to renew the loan. Shaid had every reason to do so, since the loan was becoming due and since he knew the Chandler State Bank would attempt to satisfy the debt with the fraudulent CD's. Such an attempt by Chandler State Bank easily could have uncovered Shaid's activities.

## IV. THE BANK ROBBERY COUNTS (COUNTS EIGHTEEN AND NINETEEN)

■ Appellant asserts that the government failed to demonstrate a violation of 18 U.S.C. § 2113(a). Appellant argues that a violation of 18 U.S.C. § 2113(a) requires entering a bank to commit a *violent* felony. At trial, the district judge noted that the Supreme Court was currently considering that very issue. Since that time, the Supreme Court has ruled, and that Court's ruling is adverse to appellant's contention. *See Bell v. United States,* —— U.S. ——, 103 S.Ct. 2398, 2402, 76 L.Ed.2d 638 (1983) ("[T]he Congressional purpose plainly was to protect banks from those who wish to steal banks' assets—even if they use no force in doing so.").

## V. THE SPEEDY TRIAL ACT

■ Finally, appellant contends that he was tried in violation of the Speedy Trial Act. We disagree.

---

15. Of course, had the loan become due and had Shaid not repaid the loan, the Chandler State Bank would have attempted to use the altered CD's for payment. Shaid knew his scheme would be discovered if the Chandler State Bank tried to receive the proceeds from the altered CD's.

The record does demonstrate that appellant was tried 126 days after his arrest, a period of delay in excess of the ninety day period set forth in 18 U.S.C. § 3164. However, § 3164(b) specifically states that "the periods of delay enumerated in § 3163(h) are excluded in computing the time limitation specified in this section." The time excluded by the court includes the fourteen days between the filing and ruling on several of the appellant's pretrial motions, eight days between March 13 and March 21 based on the trial court's acknowledged complexity of the case, and fourteen days between March 21 and April 4, based on the appellant's request for additional time to respond to the superseding indictment and, once again, upon the complexity of the case. These time periods were excluded properly under the express provisions of 18 U.S.C. § 3163(h). Hence, when the foregoing time periods are excluded, it becomes apparent that the appellant was tried well within the ninety day confinement rule of the Speedy Trial Act. Finally, we note that the district court was most cognizant of the Speedy Trial Act, did all that was reasonably necessary to protect the defendant's interests under that act, while recognizing that certain time periods must be excluded in light of the appellant's numerous pretrial motions and the apparent complexity of the case.

## VI. CONCLUSION

We note that we have considered the remaining contentions raised by the appellant in his brief and find them all to be without merit. For the foregoing reasons, the judgment of the district court is affirmed in all respects.

AFFIRMED.