**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rhea Lucky NICHOLS and Michael
Ford, a/k/a L.D. Haufer,
Defendants-Appellants.**

**No. 81–1423.**

United States Court of Appeals,
Fifth Circuit.

Dec. 23, 1982.

Malcolm Dade, Thomas V. Murto, Dallas, Tex., for Nichols.

Michael P. Carnes, Thomas D. Glenn, Dallas, Tex., for Ford.

Margaret I. Miller, Atty., Dept. of Justice, Washington, D.C., for U.S.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

GOLDBERG, Circuit Judge:

This is an appeal by two coconspirators from their convictions for fourteen counts of mail fraud, 18 U.S.C. § 1341 (1976), and one count of conspiracy to commit mail fraud, 18 U.S.C. § 371 (1976). We now affirm these convictions.

## I. INTRODUCTION

### A. The Facts of the Fraudulent Falling Fan

In April and May of 1978, the defendants conspired to stage a fake accident at Banana's Cafe in Dallas. Appellant Michael Ford, working under the assumed name of L.D. Haufer, and codefendant Mike Merritt orchestrated the scheme. Codefendant Carl Keenan, a bartender at the cafe, was the inside man; codefendant Tom Davis was to be an injured customer. Appellant Rhea Lucky Nichols, a medical doctor, was to handle the medical aspects and codefendant John Fisher, an attorney, was to handle the legal aspects.

The genesis of the scheme was in April 1978, when Ford noticed that the ceiling fans at the cafe wobbled when turned on. Over the next few weeks Ford, Merritt, Keenan, and Davis discussed the possibility of staging an accident involving a ceiling fan. Early on the morning of May 23, 1978, Keenan unlocked the cafe and Ford, Merritt, and Davis entered. They removed one of the fans and stashed it away unobtrusively. The four then left the cafe. A few minutes before the cafe opened for business, Keenan again admitted Ford, Merritt, and Davis. They sat at a table underneath the mounting fixture of the now-detached ceiling fan, and Keenan served them drinks. At an opportune moment, when that room of the cafe was deserted, Ford retrieved the detached fan and slammed it down on the table where they were sitting. Davis and Merritt lay on the floor, as if in pain. To add authenticity, Ford hit Davis in the back to make a bruise and cut his coat with a pocket knife. Keenan called a waitress, who called an ambulance. Davis was taken to a hospital emergency room and Merritt followed in his car. Both were treated and released.

The next morning Merritt, Davis, Ford, and Fisher met at Merritt's auto garage (Davis was Merritt's employee). Ford called Dr. Nichols, arranged an appointment, and verified the symptoms Davis was to allege. Davis saw Dr. Nichols and was given a series of X-rays and heat or sonic treatment. Davis returned to Dr. Nichols two or three more times.

The clinic records for Davis' visits were unusual. They were in Nichols' handwriting and showed thirty-five visits, contrary to Davis' testimony that he went to the clinic at most four times. The patient chart Nichols made also showed several prescriptions for Darvon, though the clinic's "Darvon Book," which was a record of all Darvon prescriptions dispensed, showed only one. Finally, the records and billing were all segregated from the clinic's usual billing procedures.

Following his medical treatment, Davis, with the aid of Ford, Fisher, and Merritt, filed a claim against the cafe's insurance carrier. When the carrier contested the claim, Davis filed suit. It was in the prosecution of this claim that Davis' insurance carrier and its attorneys mailed the fraudulent documents that were the basis of the mail fraud charges. Apparently, during the pendency of this suit, Keenan and Davis were caught in an unrelated fraud scheme. They cooperated with the government, led the postal inspectors to this scheme, and the inspectors moved in.

### B. Proceedings Below

Merritt escaped and was at large at the time of trial. Keenan and Davis pleaded guilty and testified for the government. Fisher's case was severed so he could undergo an examination to determine his competency to stand trial; he later pleaded guilty

to conspiracy. Appellants Ford and Nichols were tried before a jury and convicted. Nichols was sentenced to concurrent terms of three years on all fifteen counts. Ford was sentenced to consecutive terms of five years on the first eight mail fraud counts and concurrent terms of five years on the remaining seven counts, for a total sentence of forty years. Nichols and Ford now appeal.

### C. Arguments on Appeal

Nichols was convicted in large measure due to the hearsay testimony of his coconspirators. Such testimony is admissible under Fed.R.Evid. 801(d)(2)(E), following the procedures set out in *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Nichols argues that the trial court's *James* proceedings were defective and that the coconspirators' statements should not have been admitted. Without these statements, Nichols claims, there was not sufficient evidence to support a conviction. Nichols further complains that his motion for a separate trial was improperly denied. Finally, Nichols argues the trial court should have declared a mistrial when a witness improperly referred to an earlier indictment of Nichols.

Ford argues that his forty-year sentence constitutes cruel and unusual punishment, that the trial court's *James* proceedings were defective, and that there was not sufficient evidence to support his conviction.

## II. NICHOLS' CLAIMS

### A. James *Error*

A conspiracy charge is a favorite weapon in the prosecutor's arsenal. Among its other attributes, it allows the introduction of otherwise inadmissible testimony. " 'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). In the truthseeking process the courts have generally eschewed hearsay testimony, Fed.R.Evid. 802, however, a statement is not considered to be hearsay if it "is

offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Thus, in a trial against A for mail fraud, the testimony of B that "C told me A would commit mail fraud" is normally inadmissible. In a trial for conspiracy to commit mail fraud by A and C, however, the statement would be admissible.

■ The crime of conspiracy being a potent weapon, the caliber of its ammunition must be carefully gauged, and courts have devised procedures to prevent misfires in the admission of coconspirator's statements. Before the statement can be admitted, it must somehow be established that: (1) there is a conspiracy; (2) the statement was made during the course and in furtherance of the conspiracy; and (3) the defendant and declarant were members of the conspiracy. *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), establishes the procedures to be used in this Circuit for admitting coconspirator's statements.

■ *James* holds that these three issues are preliminary questions concerning admissibility to be determined by the court, Fed.R.Evid. 104(a), rather than conditional facts determining relevancy, Fed.R.Evid. 104(b). *James,* 590 F.2d at 577–80. In order to prevent the jury's being prejudiced by inadmissible hearsay, *James* establishes two procedural safeguards. Ideally, before trial the prosecutor should make a showing of substantial independent evidence that the statement is admissible. Then at the conclusion of evidence, considering both the prosecution's evidence *and* the defense's evidence, the trial court must find that the preponderance of the independent evidence shows the statement is admissible.

The district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator. If it determines it is not reasonably practical to

require the showing to˙ be made before admitting the evidence, the court may admit the statement subject to being connected up.

### (D) At the End of the Trial

Regardless of whether the proof has been made in the preferred order, or the coconspirator's statement has been admitted subject to later connection, on appropriate motion at the conclusion of all the evidence the court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy. Rule 801(d)(2)(E). If the court concludes that the prosecution has not borne its burden of proof on these issues, the statement cannot remain in the evidence to be submitted to the jury. In that event, the judge must decide whether the prejudice arising from the erroneous admission of the coconspirator's statements can be cured by a cautionary instruction to disregard the statement or whether a mistrial is required.

*Id.* at 582–83 (citations omitted).

The *James* procedure as just described was not precisely followed in this case. Here the initial *James* hearing was not an evidentiary hearing, but rather a proffer hearing; both the prosecution and defense outlined the evidence they proposed to introduce, which in fact was introduced.

Based on that proffer, the trial court allowed the coconspirators' statements into evidence. At the close of the prosecution's case, counsel for Nichols moved that the coconspirator statements be excluded; the trial court denied the motion. This motion was not renewed at the close of the defense's case.

■ There was no error in the trial court's failure to hold an evidentiary hearing before trial. *James* does not mandate *any* hearing before trial, but merely indicates that one should be held "whenever reasonably practicable." *James,* 590 F.2d at 582. *See also United States v. Hawkins,* 661 F.2d 436, 449–50 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2274, 73 L.Ed.2d 1287, —— U.S. ——, 102 S.Ct. 2967, 73 L.Ed.2d 1355 (1982); *United States v. Ocanas,* 628 F.2d 353, 359–60 (5th Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981). Here the trial court felt that an evidentiary hearing would be unduly burdensome, Record at 13–18, 24–29, and held a proffer hearing. "Whatever be the form of the hearing, its use is merely to inform the trial judge as to whether or not the proponent of coconspirator statements has sufficient evidence that they [are admissible]." *United States v. Ricks,* 639 F.2d 1305, 1309 (5th Cir.1981). We will not condemn this procedure, and the record supports the trial judge's initial finding of admissibility.[1]

■ At the close of the prosecution's case, counsel for Nichols moved to strike the coconspirators' statements. *James* requires the trial judge, upon proper motion, to find whether a preponderance of the independent evidence shows that a conspir-

---

1. Though *James* would allow admission of a coconspirator's statement premised solely on a promise that it will later be "connected up," *see e.g., United States v. Leon,* 679 F.2d 534, 540 (5th Cir.1982); *United States v. Whitley,* 670 F.2d 617, 620 (5th Cir.1982), the trial judge who does so runs a grave risk.

To reveal to the jury what someone has said, out of court, incriminating *the defendant is* strong medicine. Should such a revelation be made and it then appear that no facts existed justifying the revelation, the defend-

ant would have been unlawfully and most seriously prejudiced. *The waste of a mistrial would be likely; restoration of fairness through corrective instruction would be difficult if possible at all.*

*United States v. Ricks, supra,* 639 F.2d at 1308 (emphasis added).

If the trial court finds holding a pretrial hearing to be impractical, the serious consequences of error would seem to justify at least requiring a proffer of substantial, independent evidence, as the trial court here required.

acy existed, that the defendant and declarant were members of the conspiracy, and that the statement was made during and in furtherance of the conspiracy. At the time of Nichols' motion much independent evidence supported the trial court's findings. Davis testified that he had seen Nichols at Merritt's garage and that Nichols appeared to be a close associate of Merritt and Ford. Record at 482–83, 487. Davis saw Nichols because Merritt and Ford had arranged Davis' appointment with Nichols. Record at 492. Nichols provided documentation of Davis' treatment used in the fraudulent lawsuit. There were many irregularities in the way Davis' records were maintained by Nichols. Nichols' own handwritten records showed Davis made over thirty visits to the clinic, but Davis testified he had made only four. Record at 339–401, 492–97. Billing procedures were very irregular. Record at 390–401. Finally, Nichols' records showed drugs dispensed but not reflected in the clinic's records.

Some testimony elicited on cross-examination could be viewed as exculpatory. Dr. Boyd, another doctor at the clinic, stated that Nichols might have given Darvon to Davis out of Nichols' personal supply of samples to avoid formal billing procedures, and that could be why clinic records did not show the prescription. Record at 440, 467. Also, Nichols appeared to suggest referring Davis to a specialist if the problem persisted—strange behavior for a secretive conspirator. Record at 422–24.

Nichols' main argument is that Davis' testimony was unreliable, but judging the credibility of the witness is a matter for the trial court. The trial judge's *James* findings must be upheld unless clearly erroneous. *United States v. Dean,* 666 F.2d 174, 179 (5th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2300, 73 L.Ed.2d 1303, —— U.S. ——, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982); *United States v. Perry,* 624 F.2d 29, 31 (5th Cir.1980). We hold the findings not to be clearly erroneous.

Nichols also argues that evidence presented in his defense at trial demonstrates that he was an innocent pawn of the conspiracy. Nichols testified that he had no knowledge of the conspiracy and had taken Davis as a patient as a favor to Nichols' mechanic, Merritt. Record at 794–95. Because Davis was a private patient, outside the clinic's normal business of workmen's compensation cases, Nichols claimed he did not really care about being paid and segregated Davis' records to avoid invoking the machineries of debt collection. Record at 794–95, 841. Nichols and the X-ray technician both testified that Davis had been in several times, at least more than the four times Davis admitted. Record at 683–84, 808, 833. Finally, Nichols treated Davis' condition precisely as a nonconspiring doctor would—he diagnosed the problem as temporary and minor, and an independent physician evaluated the X-rays at trial the same way. Record at 753–56, 843.

Such exculpatory defense evidence may be considered in making the second *James* "preponderance" finding, but only "on appropriate motion at the conclusion of all the evidence." *James,* 590 F.2d at 582. Nichols did not make an appropriate *James* motion at the conclusion of all the evidence, so we may not consider this exculpatory defense evidence in reviewing the trial court's *James* "preponderance" finding. *United States v. Sutherland,* 656 F.2d 1181, 1199 n. 14 (5th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). Our only consideration of the defense evidence is whether, in light of that evidence, it was plain error for the trial judge to fail to strike the coconspirators' statements. *United States v. Chaney,* 662 F.2d 1148, 1154 n. 7 (5th Cir.1981). We cannot say it was plain error for the trial judge to believe the government's version of the facts rather than the defendant's. Accordingly, we affirm the trial court's *James* procedures and findings.[2]

---

**2.** Nichols' argument that there was insufficient evidence to support his conviction is predicated on exclusion of the coconspirators' statements.

Because we affirm the admission of those statements, Nichols' sufficiency argument fails.

### B. Testimony on Nichols' Previous Indictment

■ One of Nichols' partners, Dr. Boyd, testified for the government regarding clinic procedures and the records kept on Davis and Merritt. Although Boyd and Nichols had been partners for about thirteen or fourteen years, Boyd had not told Nichols of the investigation pending against him. On cross-examination, Nichols' counsel sought to explore Boyd's motives for not confiding in his long-time partner, Nichols. During Boyd's cross-examination, Boyd made a reference to a previous indictment of Nichols.[3] At the first break in the trial, Nichols' counsel moved for a mistrial on that ground, but the motion was denied. In an effort to cure the damage to Nichols' reputation, Nichols called several character witnesses, and on cross-examination they were asked about the earlier indictment without objection. The trial judge gave the jury a strong charge not to consider the earlier indictment. Nichols now argues the trial court erred in denying a mistrial.

In this line of questioning on cross-examination of Boyd, Nichols' counsel was trying to show that by not informing Nichols of the pending investigation, Boyd was not acting like a partner of thirteen or fourteen years:

Q. Okay. The day all of this came out, had you ever prior to that time taken or talked to a man who had spent what 13 or 14 years, had you ever said, "Sit down Rhea, I want to talk to you." Had you ever done that?

A. Yes, sir.

Q. All right. And had you told Dr. Nichols now, look, this is what they say you've done wrong. Did you ever tell him that?

A. Yes, sir.

Q. You told him that he was accused of defrauding or trying to defraud an insurance company?

A. No, sir.

Q. You didn't tell him that, did you?

A. The question was asked had I ever sat down with him in reference to what he had done wrong, this not being his first indictment. We had had previous occasions to talk.

Record at 443–44. The trial judge ruled that, in context, the question called for an answer as to whether Boyd had in the last thirteen or fourteen years talked to Nichols about his wrongdoing. We agree. Injection of inadmissible evidence attributable to conduct by the defense is not reversible error. See, e.g., United States v. Lerma, 657 F.2d 786, 788 (5th Cir.1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 463 (1982); United States v. Martinez, 604 F.2d 361, 366 (5th Cir.), cert. denied, 444 U.S. 1034, 100 S.Ct. 708, 62 L.Ed.2d 671 (1979). Accordingly, the trial court's ruling is affirmed.

### C. Motion for Separate Trial

■ Prior to trial Nichols moved for a separate trial on the ground that his defense was incompatible with codefendant Ford's defense. At the close of the government's case Nichols renewed the motion on the additional ground that Ford might testify for Nichols at a separate trial. The trial court denied both of these motions. Granting a motion for severance rests in the broad discretion of the trial court, and an appellate court will reverse only on a clear showing of abuse of that discretion. See, e.g., United States v. Welch, 656 F.2d 1039, 1053 (5th Cir.1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173, 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982); United States v. Martino, 648 F.2d 367, 385–86 (5th Cir.1981), cert. denied, 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465, 456 U.S. 943, 102 S.Ct. 2007, 72 L. Ed.2d 465, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

■ A court should grant severance for antagonistic defenses when the conflict is "so irreconcilable that the jury will infer that both defendants are guilty solely due

---

3. The prior indictment apparently was a state charge from about ten years ago, which was subsequently dismissed.

to the conflict," *United States v. Herring,* 602 F.2d 1220, 1225 (5th Cir.1979), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980), or when the defenses are "irreconcilable and mutually exclusive," *United States v. Grapp,* 653 F.2d 189, 193 (5th Cir.1981) (quoting *United States v. Horton,* 646 F.2d 181, 186 (5th Cir.1981)). Nichols' defense was that he was an innocent bystander who had no knowledge of the conspiracy and that the government's witnesses were lying when they said otherwise. Ford's defense was that the accident was real, and that the government's witnesses were lying when they said otherwise.[4] The trial court did not abuse its discretion in holding that these two defenses were not antagonistic.

 Nichols' renewal of the motion for severance was made at the close of the government's case, well after trial had begun. The trial court denied this, in part because the motion was not timely. *See, e.g., United States v. Butler,* 611 F.2d 1066, 1071 (5th Cir.), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980). In his renewed motion for severance, Nichols added the ground that at a separate trial held after Ford's trial, Ford might offer exculpatory testimony. For such a severance, "the defendant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed." *United States v. Duzac,* 622 F.2d 911, 912 (5th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980) (citations omitted). When counsel for Nichols took a proffer of testimony from Ford, Ford stated only that he would probably be willing to testify in a separate trial and did not say his testimony would be exculpatory. Record at 856–57. Furthermore, counsel for Nichols conceded that even in a separate trial he might not call Ford because of the danger of "rub-off" from Ford, who had been convicted of many

felonies. Record at 855. Based on this testimony, the trial judge denied the second motion for severance on the additional ground that it was insufficient. Denial of the motion on either ground, sufficiency or timeliness, was not an abuse of the trial court's discretion.

## III. FORD'S CLAIMS

 Ford's primary claim is that his sentence of forty years constitutes cruel and unusual punishment because it is disproportionate to the crime and disproportionate to the sentences given the other coconspirators. The Supreme Court has been much more concerned with disproportionality in the context of the death penalty. *Compare Enmund v. Florida,* ── U.S. ──, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (death penalty for felony murder where defendant was not involved in actual murder held unconstitutional); *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (death penalty for rape held unconstitutional) *with Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (life sentence under repeat offender statute for felonies resulting in loss of $229.11 held not disproportionate). Given *Rummell* we certainly must uphold the constitutionality of the statutory punishment for mail fraud.

Ford also claims that his sentencing was an abuse of discretion. This position is supported by two arguments. First, Ford's sentence is substantially greater than his codefendants, who received sentences ranging from six months to three years. Second, all fourteen counts of mail fraud relate to the same fraudulent scheme, and it was not Ford himself who mailed the documents pursuing the fraudulent insurance claim.

 We are unpersuaded by Ford's argument. First, Ford's circumstances were widely different from those of his coconspirators. They were first offenders, and some had cooperated with the government.

---

**4.** Nichols' counsel expressly stated that he took no position on the reality of the accident. Rec-

ord at 972.

Ford was a multiple offender and, along with Merritt, had masterminded the scheme. Second, the law is well settled that each individual mailing can constitute a mail fraud violation, *see, e.g., United States v. Saxton,* 691 F.2d 712 (5th Cir. 1982); *United States v. Ashdown,* 509 F.2d 793, 800 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975), and a defendant is culpable for mail fraud even if he did not actually mail the document, provided the mailing is a reasonably foreseeable event. *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954). A trial court has wide discretion in determining what sentence to impose on a convicted defendant. *See, e.g., United States v. Small,* 636 F.2d 126 (5th Cir.1981); *United States v. Atkins,* 618 F.2d 366, 373–74, (5th Cir.1980). The sentence given Ford was well within the statutory limit of seventy-five years, was not an arbitrary or capricious action constituting a gross abuse of discretion, and therefore, must be upheld.

Ford also argues that the trial court's pre-trial *James* procedures were defective. As we stated in Part II.A, *supra,* those procedures were valid. Finally, Ford argues that with the coconspirators' statements excluded, there is insufficient evidence to support his conviction. However,

because we hold the coconspirators' statements were properly admitted, there was sufficient evidence to support Ford's conviction.[5]

## CONCLUSION

The judgment of the trial court is in all matters

AFFIRMED.

GARWOOD, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the excellent majority opinion relating to the claims of appellant Nichols, and with almost all of it that concerns appellant Ford. However, I respectfully dissent as to Ford's conviction on count 7.[1] In my opinion the evidence does not show a sufficient nexus between the mailing charged in that count and the fraudulent scheme to establish that any of the conspirators "knowingly cause[d]" the mailing "for the purpose of executing such scheme" as required by the mail fraud statute, 18 U.S.C. § 1341.

None of the mailings charged in the several counts were by any of the conspirators or any one on their behalf or at their direction.[2] Each such mailing originated and terminated in Dallas County.

---

5. Additionally, Ford argues that the coconspirators' credibility was bad, so their testimony should be discounted. Weighing the credibility of witnesses is a matter for the trier of fact, not for an appellate court.

1. Ford and Nichols were each convicted of fourteen separate mailings (counts 1–14) in violation of 18 U.S.C. § 1341, and of conspiracy to violate § 1341 (count 15). Ford was sentenced to consecutive five year terms on each of counts 1 through 8, for a total of 40 years, and to five year terms on each of counts 9 through 15, the terms on these seven latter counts to run concurrently with those on counts 1 through 8. Because of the concurrent feature of Ford's sentence respecting counts 9 through 15, there is no occasion to consider the validity of any of those counts. Nichols' sentence was concurrent on all counts, so any deficiency in proof regarding count 7 or any of counts 9 through 15 would not require reversal in Nichols' case.

2. I refer to the conspirators generally, instead of simply to appellant Ford, as this Court has long held that each knowing co-participant in a scheme to defraud is chargeable under § 1341 with the acts of every other co-participant in mailing any item, or in knowingly causing such a mailing to be made, pursuant to and for the purpose of executing or attempting to execute such scheme. *See United States v. Toney,* 598 F.2d 1349 at 1355 (5th Cir.1979), *cert. denied,* 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). *Cf. United States v. Cohen,* 145 F.2d 82 at 90, 91 (2d Cir.1944), *cert. denied,* 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945) (agreement necessary to establish guilt of the substantive § 1341 offense on the "co-participant" theory differs from that necessary to establish conspiracy to violate § 1341, in that the latter requires that the agreement contemplate use of the mails, while the former requires agreement on only the fraudulent scheme and that any *one* of the participants, pursuant thereto, *in fact* mails something, or knowingly causes it to be mailed, for the purpose of executing the

The fake falling ceiling fan accident in which co-conspirator Davis feigned injury was staged at Banana's Cafe in Dallas on May 24, 1978. The incident was reported to the cafe owner who in turn reported it to the Dallas insurance agency through which Banana's had acquired its liability insurance. The agency reported it to the Dallas office of the liability insurer, which turned the investigation over to a Dallas independent adjuster. Contact was made between the adjuster and Fisher, a Dallas attorney and co-conspirator who was representing the supposedly injured Davis in his claim. Fisher furnished the adjuster a variety of "information," including statements from Davis and co-conspirator Keenan, a copy of Davis's income tax return, and Davis's medical bills from the emergency room and from co-conspirator Nichols. The adjuster sent this material to the insurance company's Dallas office in August 1978. In May 1979 Fisher filed suit in Dallas on behalf of Davis against Banana's. The citation in the suit found its way to the Dallas office of Banana's liability insurer. When Dallas attorney Fowler, who frequently represented that company on such matters, happened to be present in this office for another purpose, he was retained to represent the company and its insured in Davis's suit and was handed the papers. The record indicates that thereafter there was rather frequent telephone contact between Fisher and Fowler. There is no showing that the case was ever set for trial. In the afternoon of Friday, October 26, 1979, Davis' oral deposition was taken at Fowler's office. There is no indication of who arranged for, suggested or requested the deposition, but it recites that it was taken pursuant to agreement. At the deposition Fowler requested of Fisher, who was present representing Davis, copies of witness statements, income tax returns and medical bills (most, if not all, of which Fisher had previously furnished the adjuster who in turn had furnished them to the insurance company). Fisher thereupon agreed to furnish these. There is no indication that Fowler did in fact expect, or would likely have expected, to receive the scheme, regardless of whether the agreement

requested documents on or before October 29. Whether, and if so when, Fisher ever furnished Fowler any of this material is not disclosed by the record. On Monday, October 29, 1979 Fowler wrote Fisher reminding him of his agreement to furnish the documents. The mailing of this October 29 letter is the basis of count 7.

In my opinion, this letter was at most "incidental and collateral to the scheme," *Kann v. United States,* 323 U.S. 88 at 95, 65 S.Ct. 148 at 151, 89 L.Ed. 88 (1944); *United States v. Kent,* 608 F.2d 542, 546 n. 6 (5th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980), and was not "for the purpose of executing" it as required by § 1341. There is nothing to suggest that whether Fowler reminded Fisher to furnish the documents was in the least material to the execution of the scheme. *See United States v. Maze,* 414 U.S. 395 at 401, 402, 94 S.Ct. 645 at 649, 650, 38 L.Ed.2d 603 (1974). There is no evidence indicating that either the completion of the scheme or the prevention of its detection depended to any extent on, or would be in any way affected by, the mailing of this letter or the transmission of the message it contained. *See United States v. LaFerriere,* 546 F.2d 182 at 187 (5th Cir.1977). *See also United States v. Georgalis,* 631 F.2d 1199 at 1205 (5th Cir.1980).

Moreover, in my opinion there is no evidence that any of the conspirators "knowingly cause[d]" this mailing as § 1341 requires in instances such as these. It cannot simply be assumed that when at the Friday afternoon deposition Fisher agreed to Fowler's request that he be furnished certain documents, Fisher (or any other conspirator) expected or should have expected Fowler to mail him a reminder letter if Fowler had not received the papers on Monday. If we might assume that the jurors knew what is common knowledge in the legal profession, we could say that such confirmatory or reminder letters are sent on many occasions, and on many other occasions are not, often depending on the cus-

contemplated that the mails would be used).

tom in the locality or the practice followed by a particular lawyer, or on other factors, such as whether the requested material is supplied within a reasonable time. No particular actions of any of the conspirators can be fairly characterized as being such as would probably lead to this mailing. In this respect the case is entirely different from that in which a local bank's mailing of a check drawn on an out of state bank is the foreseeable probable result of presenting the check to the local bank, *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), or in which a local insurance company representative's mailing of a claim to the company's out of state home office for payment in accordance with established procedures is the foreseeable probable result of submitting the claim to the local office, *United States v. Kenofskey,* 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836 (1917), or in which a merchant's mailing of a credit card charge to an out of state bank is the foreseeable probable result of making purchases from the merchant by using a credit card issued by the bank. *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 647, 38 L.Ed.2d 603 (1974). Nor is this a situation in which the mailing is a solicited response. *Cf., e.g., United States v. Saxton,* 691 F.2d 712 (5th Cir.1982) (mailings of applications for credit cards and of credit cards issued in response to applications); *United States v. Toney,* 598 F.2d 1349, 1354–55 (5th Cir.1979) (co-conspirator "Rice caused Carver [victim Clubb's attorney] to mail the count letters by repeatedly inviting Clubb or Carver to continue communicating with him" as a "delaying tactic" or a means of "lulling" the victim).

That the mails are used in the course of a scheme or artifice to defraud does not suffice to make out a violation of § 1341. The terms of § 1341 require the presence of two additional elements: that a participant in the scheme, or one acting on his behalf, either mail, or take from the mail, or "knowingly cause[ ]" the mailing of, some "matter or thing"; and, that such is done "for the purpose of executing such scheme or artifice or attempting to do so." We have no more warrant to narrowly construe

these requirements than we do to read them out of the act. The settled rule that criminal statutes are to be construed strictly in favor of the accused, *United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971), *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), plainly applies to § 1341. *Fasulo v. United States,* 272 U.S. 620, 629, 47 S.Ct. 200, 202, 71 L.Ed. 443 (1926); *United States v. Edwards,* 458 F.2d 875, 880 (5th Cir.), *cert. denied,* 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148 (1972). Because in my opinion the referenced elements of § 1341 were not proved respecting count 7, I would reverse Ford's conviction on that count.