UNITED STATES of America,
Plaintiff-Appellee,

v.

Clarence J. DeROCHE, Sr.,
Defendant-Appellant.

No. 83–2250.

United States Court of Appeals,
Fifth Circuit.

Feb. 24, 1984.

Rehearing Denied April 25, 1984.

Dickerson, Hamel, Early & Pennock, William L. Bowers, Jr., Houston, Tex., for defendant-appellant.

James R. Gough, John M. Potter, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before POLITZ, JOHNSON and WILLIAMS, Circuit Judges.

PER CURIAM:

Defendant Clarence DeRoche, Sr., stands convicted of possession and sale of stolen property moving in interstate commerce, pursuant to 18 U.S.C. §§ 2315 and 659, and conspiracy to commit an offense against the United States, pursuant to 18 U.S.C. § 371. On appeal, DeRoche seeks reversal of his convictions alleging that the trial court admitted hearsay testimony of alleged co-conspirators in violation of this Court's *en banc* holding in *U.S. v. James,* 590 F.2d 575 (5th Cir.) (*en banc*), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Additionally, DeRoche asserts that there is insufficient evidence to sustain his convictions

once the improperly admitted hearsay statements are excluded. Finding plain error in the trial court's failure to adhere to the principles set forth in *James* and its progeny, we reverse and remand for a new trial.

## I. *Facts and Course Of Proceedings*

The criminal charges in this case arose from the theft of oil field equipment known as blowout preventers. Six men were indicted for the theft: Guy Duprie, Dewey Landry, Jerry Dickinson, Joseph Wilkerson, John Carter and the defendant here, Clarence DeRoche, Sr. At the time of the theft, Wilkerson and Carter lived in Mississippi; the other four resided in Louisiana.

In the latter part of 1982, Carter and Duprie discussed acquiring certain oil field equipment by theft. Carter agreed to steal the equipment, if Duprie would arrange for its sale; Duprie later recruited Landry, an acquaintance of Duprie, to handle the money received from the sale of the stolen equipment. When Carter and Duprie met again at Duprie's home in December, 1982, Carter described to Duprie the kind of equipment that Carter was "sure [he] could lay [his] hands on...." Duprie then telephoned "his man in Houma," whose identity, at that time, was unknown to Carter. Duprie was unable to arrange for a sale of equipment through the "man from Houma" that night.

Late the next night, Duprie called Carter at Dickinson's home, where both Carter and Wilkerson were staying. Duprie told Carter that the equipment they wanted was in Stephensville, Louisiana, a small town near Morgan City. Carter, Wilkerson, and Dickinson picked up Carter's semi-trailer tractor, and then went on to Stephensville, where Carter and Wilkerson found a tractor-trailer rig loaded with two blowout preventers parked near a small restaurant-bar. They disconnected the tractor that was under the trailer and substituted Carter's tractor. Carter then telephoned Duprie,

who instructed Carter to meet him in Beaumont, Texas, and suggested that Carter travel on secondary roads to avoid the police patrols on the interstate highways. In response to a call from Duprie, Landry met Duprie at his home. When DeRoche also arrived at Duprie's home, the three men departed for Beaumont together, Landry and Duprie in Duprie's car, and DeRoche following in his own car.

Carter, Wilkerson, and Dickinson drove to the Union 76 truck stop in Vidor, Texas, a short distance east of Beaumont, arriving at about 7:00 a.m. When Duprie had not arrived by 9:30 a.m., Carter called Duprie's home. Duprie's wife gave Carter the telephone number of a truck stop west of Beaumont, and Carter then paged Duprie at the other truck stop. Duprie and Landry arrived at the Union 76 truck stop a few minutes later. DeRoche followed them in his own car. Out of DeRoche's presence, Duprie identified DeRoche to Carter as "my man from Houma," and said that they had worked together before. This was the first time that Carter had met DeRoche.

DeRoche examined the blowout preventers from the ground, then made some telephone calls. The prospective buyers wanted the serial numbers from the equipment before agreeing to buy it,[1] so DeRoche and Landry climbed onto the trailer and wrote down the serial numbers. DeRoche then made several more telephone calls. After he completed the calls, all six men drove toward Houston, once again using secondary roads. Near Beaumont, DeRoche stopped to make another telephone call. Duprie and Carter, together in Duprie's car, stopped also, while Dickinson and Landry, in the tractor, and Wilkerson, in Carter's car, continued toward Houston. The four vehicles met again at a truck stop in Houston, where DeRoche made some more calls. Duprie and Carter remained at the truck stop, while the other four men drove to the Tri-Con yard in Houston, DeRoche and Lan-

---

1. Blowout preventers were in scarce supply at the time of the theft; checking the serial numbers enabled the prospective purchaser to determine that the equipment in fact existed, that it was not stolen, and that it was the proper size and type. Since it was unlikely that such a recent theft had been reported to Houston-area law enforcement authorities, Duprie felt that it was safe to give the prospective buyers the requested serial numbers.

dry in DeRoche's car, and Dickinson and Wilkerson in the tractor.

When the four men arrived at Tri-Con, DeRoche left the other men in the yard and entered the office. The purchaser did not have the purchase money ready, so the sellers waited. At about 3:00 p.m., Duprie and Carter became concerned about the delay, left the truck stop, and drove to Tri-Con. Several times during the afternoon, DeRoche came out of the office to tell Duprie and the others that the money was still being counted. After each visit to the yard, DeRoche returned to the office alone.

Sometime after 5:00 p.m., the owner of Tri-Con, William Hutchinson, arrived. He explained that the financing arrangements could not be completed until the next morning and gave DeRoche a cashier's check for $300,000 as a token of good faith. DeRoche gave the check to Duprie. Dickinson, at the direction of Carter, backed the equipment and trailer into the Tri-Con warehouse and disconnected the tractor. The group then split up, DeRoche going to one motel, the others to another.

The following morning, all six men met at the Tri-Con yard. There was another delay, but late in the morning Landry, Duprie, and an independent equipment broker, Gerald "Skip" Vonsteen, went to Hutchinson's bank. At the direction of Duprie, Landry exchanged the $300,000 check for $100,000 in cash and four $50,000 cashier's checks, one payable to Landry, the other three checks payable to Guy Duprie. The cash and checks were placed in a briefcase, and the three men then returned to the Tri-Con yard. In their absence, FBI agents had arrested Dickinson, Wilkerson, and Carter at the Tri-Con yard and had stopped DeRoche a short distance away as he drove away alone in his car. When Duprie noticed strangers and unusual activity in the yard, he sped away and drove to a convenience store, which had a public telephone. Shortly after Vonsteen left the car to call the Tri-Con office, two patrol cars arrived, and all three men were arrested. Vonsteen was later released.

Duprie, Landry, Carter, Dickinson, Wilkerson, and the defendant here, DeRoche, were all accused of the theft and transportation of the blowout preventers in the same indictment. Under various plea-bargaining agreements that provided for the dismissal or nonprosecution of the federal charges against them, three of the co-indictees, Carter, Dickinson, and Wilkerson, testified for the government. The remaining co-indictees, Landry, Duprie, and the defendant here, DeRoche, were tried together in the instant case. Landry testified in his own defense; Duprie and DeRoche did not. Only DeRoche has appealed his convictions.

Before trial began, DeRoche requested that the trial court either require the prosecution to follow the order of proof preferred by the *James* court or hold a *James* hearing to determine whether Carter's statements were admissible. The trial court did not act on that motion, and at the time the trial began, the motion was still pending. On two occasions during the trial, *the government* (not the defendant) asked the trial court to rule that sufficient independent evidence of a conspiracy had been offered and that the requirements of Fed.R. Evid. 801(d)(2)(E) had been met. On both occasions, the trial court explicitly stated that it found Carter's testimony not believable and that a conspiracy had not been established by a preponderance of the evidence. Record, vol. II, at 24, 43–45. The trial court did limit the use of co-conspirator statements during the remainder of the trial,[2] but it did not issue cautionary instructions to the jury at the close of evidence. DeRoche made no objection to the out-of-court statements at the time they were admitted or at the close of evidence, and he did not renew his original motion for a *James* hearing. The case was presented to the jury, which returned a verdict of guilty. This appeal followed.

2. Upon objection by counsel for the defendant, the court directed that the co-conspirators' statements could be used against only the defendant who was the declarant.

## II. James Error

DeRoche maintains that the trial court's failure to follow established *James* procedures requires reversal of his conviction. Finding plain error in the trial court's violation of *James* and its progeny, we agree with DeRoche's *James* argument, reverse his conviction and remand the case for a new trial.

As this Court noted recently, "[a] conspiracy charge is a favorite weapon in the prosecutor's arsenal." *See U.S. v. Nichols*, 695 F.2d 86, 89 (5th Cir.1982). With a conspiracy charge it is apparent that, as in this case, prosecutors are able to obtain evidence most damaging to an alleged conspirator by skillfully plea bargaining with other alleged conspirators in exchange for their testimony against a target defendant. This testimony—often hearsay to the accused—would be inadmissible absent the co-conspirator exception to the hearsay rule. *See* Fed.R.Evid. 801(d)(2)(E). While we by no means condemn such practices, we have recognized consistently that the testimony of a co-conspirator-turned-government-witness must be scrutinized carefully and that the trial court must follow established procedures in an attempt to avoid the improper admission of a co-conspirator's hearsay testimony. Inherently prejudicial, such testimony generally should be scrutinized carefully *before* it is presented to the jury.

As noted, while the hearsay testimony of alleged partners-in-crime is generally inadmissible, if a conspiracy charge appears in the indictment, evidential doors open and the testimony is admissible should the prosecution establish that there was a conspiracy, that the declarant and the accused were members of that conspiracy, and that the statement was made in furtherance of the conspiracy. *See* Fed.R.Evid. 801(d)(2)(E); *U.S. v. Nichols*, 695 F.2d at 89. The *en banc* court, in *James*, established procedures for safeguarding the accused against improper use of the co-conspirator exception to the hearsay rule.

The *James* court noted that, ideally, any evidence that supports the existence of the conspiracy, independent of co-conspirator statements, should be presented to the court *before* any hearsay statements of co-conspirators are presented to the jury.

The district court should, *whenever reasonably practicable,* require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a co-conspirator.

*James* at 582 (emphasis added). Nevertheless, we have allowed the trial court to admit the statement subject to being connected up when the trial court determines that pretrial examination of the statement is not reasonably practicable. *James* at 582; *U.S. v. Nichols*, 695 F.2d at 90. However, regardless of whether the predicate was established pretrial or the statement was admitted subject to later connection, at the close of all the evidence the trial court must "determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself" that the prosecution has met its burden of proof under *James*. At some point, whether pretrial or after the evidence is in, the trial court must make a *James* finding. While significant responsibility is placed upon the trial court to administer the *James* procedures, trial counsel has also been required by our precedent to request compliance with *James*. For example, when, as in the instant case, co-conspirator statements have been admitted during trial and defense counsel has failed to move for a *James* ruling at the close of all evidence, we have limited our review of the district court's actions to the plain error rule. *See U.S. v. Nichols*, 695 F.2d at 91.[3] With these *James* principles in mind, we proceed to the merits.

The critical co-conspirator hearsay testimony must be examined closely to appreciate the reasons behind our finding of plain error. At trial, co-conspirator Carter was called by the government to offer hear-

---

**3.** Plain error, of course, is one which is "so obvious that the failure to notice it would seriously affect the fairness, the integrity or the public reputation of judicial proceedings." *U.S. v. Musquiz*, 445 F.2d 963, 966 (5th Cir. 1971).

say testimony against DeRoche. Particularly damaging was Carter's testimony identifying DeRoche as the "man in Houma"—the alleged source of "hot" blowout preventers. We find this testimony most damaging, since our review of the record demonstrates that—absent Carter's testimony—little evidence was introduced demonstrating that DeRoche knowingly and actively participated in the conspiracy. Such proof would be required under 18 U.S.C. §§ 2315 and 659.[4]

Unfortunately, the action—or more correctly the inaction—of the district court requires reversal of DeRoche's convictions since a review of the record does not enable us to determine the trial court's specific *James* finding. While defendant's trial counsel admittedly failed to pursue *James* findings once he had filed his pre-trial motion, the trial court, even as a result of the prosecution's requests, twice concluded that the evidence presented by the government to establish a conspiracy was "not believable." R. IV at 24, 43–45. The trial judge on two separate occasions expressly stated that he did not believe Carter's testimony. Nevertheless, at the close of the evidence, the trial court allowed the case to go to the jury but gave no cautionary instructions of any nature concerning the co-conspirator's testimony. Clearly, the record is conflicting on the *James* finding. Expressly, the trial judge concluded that the government had failed to satisfy *James*. Impliedly, the trial court concluded that the government had satisfied *James* by submitting the case to the jury. What was actually decided by the trial court is not discernible by this Court.

In light of our inability to determine the intended findings of the trial court and in light of the critical nature of the hearsay testimony presented by Carter, we must reverse DeRoche's conviction and remand for a new trial. Upon remand, we urge the trial court to follow appropriate procedures as outlined in this opinion and in *James*. As we have seen, failure to adhere to established *James* procedure results in an inadequate record for review. We hardly can be expected to review *James* findings when none have been requested and pursued properly by defense counsel and when none have been made by the trial court. Nonetheless, sensitive to the rights of the accused when such damaging testimony is sought to be utilized, we must find plain error and reverse and remand for a new trial. In light of our resolution of the *James* issue, we need not address DeRoche's contentions regarding the sufficiency of the evidence.

REVERSED AND REMANDED.

---

4. Both statutes require knowledge that the property was stolen. 18 U.S.C. § 2315 ("knowing the same to have been stolen..."); 18 U.S.C. § 659 ("knowing the same to have been embezzled or stolen...").